Filed 6/29/26  Thompson v. Goodell CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JOHN ANTHONY THOMPSON, | |
| Plaintiff and Appellant, | G064917 |
| v. | (Super. Ct. No. 30-2021-01236291) |
| TIM GOODELL et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Nathan R. Scott, Judge. Reversed and remanded as directed.

Cummins & White, Scott R. Carpenter and Tony J. Cheng; Bruce Dannemeyer for Plaintiff and Appellant.

Much Shelist and Ryan N. Burns for Defendants and Respondents.

\*       \*       \*

Plaintiff John Anthony Thompson rented a home in Newport Beach (the property), which was owned by the Tim Goodell Irrevocable Trust (the trust). Defendant Lydia Goodell is the trustee of the trust, and her son, Tim Goodell, acted on her behalf regarding the property (collectively, defendants). [1] Thompson and defendants signed an agreement granting Thompson the option to purchase the property, which could only be exercised through written notice. Thompson later filed this lawsuit against defendants for breach of contract. Among other things, he claimed that defendants accepted his oral exercise of the option but reneged on the deal after the property's value substantially increased. Defendants argued that Thompson had not exercised the option through written notice and had forfeited his right to purchase the property.

Defendants filed a motion for summary judgment. The trial court granted the motion, finding it was undisputed Thompson had never provided written notice exercising the option. It rejected Thompson's argument that defendants had accepted his oral exercise of the option. The only evidence supporting this argument came from Thompson's declaration (Thompson's declaration), which the court found conflicted with his prior deposition testimony. Due to this perceived conflict, the court disregarded Thompson's declaration and found there were no triable issues of fact. Thompson appeals the resulting judgment.

Thompson contends on appeal that the trial court erred by disregarding his declaration. We agree. There is a reasonable explanation for the perceived conflict between the testimony from his declaration and his

---

[1] Since defendants share the same surname, we will refer to Lydia by her first name. We refer to Tim Goodell by his full name since there is more than one Tim involved in this lawsuit.

deposition. When viewing the relevant evidence in the light most favorable to Thompson, there are questions of fact as to whether Thompson orally exercised the option and whether defendants accepted this purported exercise. Summary judgment was improperly granted, and the resulting judgment is reversed and the matter remanded as directed.

FACTS AND PROCEDURAL HISTORY

I.

INITIAL TENANCY AND PURCHASE DISCUSSIONS

The property is owned by the trust, for which Lydia is the trustee. Lydia and Thompson entered into a residential lease for the property on January 16, 2019, which expired on February 29, 2020. After the lease's expiration, Thompson remained at the property on a month-to-month basis.

During this time, Tim Goodell had discussions with Thompson about Thompson purchasing the property. Defendants and Thompson eventually executed a one-page Real Estate Deposit Agreement on July 31, 2020 (the July 2020 agreement). Under the July 2020 agreement, defendants "grant[ed] to [Thompson] an exclusive option to purchase the [property]" subject to three conditions. First, Thompson would pay defendants $100,000 upon signing the July 2020 agreement. It is undisputed he made this payment. Second, Thompson would provide a verified loan approval letter or pre-approval letter. Third, Thompson agreed to pay defendants $12,500 in monthly rent from August 1, 2020 to July 1, 2021.

II.

THE PROPERTY DOCUMENTS

On September 18, 2020, Thompson and defendants executed several documents concerning the property, which were all on California Association of Realtors forms (collectively, the property documents). The

3

property documents included a new lease agreement (the lease), an option agreement (the option agreement), a purchase agreement (the purchase agreement), and several other documents relating to the property's sale.

## A. *The Lease*

The lease was dated August 2, 2020, but it is undisputed that the parties signed it on September 18, 2020. Its term expired on July 31, 2021. Like the July 2020 agreement, it required Thompson to pay defendants rent of $12,500 per month.

## B. *The Option Agreement*

Like the lease, the option agreement was dated August 2, 2020, but was signed on September 18, 2020. Thompson paid $50,000 consideration for the option, which was taken from his prior $100,000 payment under the July 2020 agreement. If Thompson exercised the option, the property's sale would be governed by the purchase agreement, which was expressly incorporated into the option agreement.

The period to exercise the option ran from August 1, 2020 to July 31, 2021 (the option period). Thompson could "exercise the Option **only** by delivering a written unconditional notice of exercise, signed by [Thompson], to [defendants]" (the written exercise requirement). Thompson was also required to give a copy of the written notice to Tim Carr, defendants' real estate broker. The option would expire without notice if Thompson failed to comply with the written exercise requirement within the option period.

The option agreement provided that "[a]ll understandings between the parties are incorporated in this [option agreement]. Its terms are intended by the parties as a final, complete, and exclusive expression of their agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement." The

4

option agreement further specified that it could "not be extended, amended, modified, altered, or changed, except in writing signed by" Thompson and defendants (the modification clause). (Boldface omitted.)

## C. *The Purchase Agreement*

The purchase agreement set the property's price at $4 million, with escrow set to close on August 2, 2021. Thompson would pay for the property with a $50,000 initial deposit, a $950,000 down payment, and a $3 million loan.[2] The purchase agreement also contained a handwritten note in a section labeled "OTHER TERMS," which stated that "[i]f buyer finalizes purchase by 11/18/20, seller will reduce purchase price to $3,975,000.00."

The other property documents executed on September 18, 2020, are immaterial to our analysis.

## III.

### EVENTS AFTER THE PROPERTY DOCUMENTS

## A. *Communication Between Thompson and Tim Goodell*

Thompson never purchased the property. It is undisputed that after signing the property documents, Thompson did not deliver a separate written notice to defendants exercising the option to buy the property.[3]

According to Thompson's declaration, he gave Tim Goodell and Tim Carr oral notice that he was exercising the option when he signed the property documents. He claimed that when he saw the option agreement on September 18, 2020, he "told Tim Goodell and Tim Carr that [he] was

---

[2] According to Thompson, the $50,000 initial deposit was also taken from the $100,000 he had previously paid under the July 2020 agreement.

[3] Thompson claims to have exercised the option by signing the purchase agreement. But that writing occurred concurrently with his signing of the property documents not after.

5

exercising the option to purchase the Property." Further, Thompson's declaration described several text messages that Tim Goodell purportedly sent Thompson about the property's sale from late September to mid-October 2020. We will describe these messages in greater detail below, but they generally concerned escrow and requested updates on Thompson's attempts to secure financing for the property's purchase.

Thompson's declaration states that he attempted to contact Tim Goodell to discuss the property's sale between December 2020 and July 2021, but Tim Goodell did not return his calls or messages. The two men finally spoke in person on July 30, 2021. During this conversation, Tim Goodell purportedly told Thompson that he wanted the property back.

B. *Thompson Files This Action*

Thompson filed this lawsuit against defendants in December 2021, and filed the operative second amended complaint in November 2022 (the complaint). The complaint generally claimed that defendants reneged on their agreement to sell Thompson the property after its value substantially increased. The complaint set forth a single claim against them for breach of contract, which appeared to be based on two different theories.

First, Thompson asserted that the purchase agreement was an independent, enforceable agreement that entitled him to purchase the property for $4 million. Second, Thompson claimed that he had exercised the option on September 18, 2020, when the parties signed the property documents. Specifically, he alleged that "[h]e told Tim Goodell and Tim Carr [on September 18, 2020] that he was exercising the option. He also delivered written unconditional notice of exercise by delivering to Tim Goodell and his real estate broker, Tim Carr, the signed Purchase Agreement. Tim Goodell

6

[allegedly] understood that Plaintiff had exercised the option. He confirmed that understanding by signing the Purchase Agreement."

While this lawsuit was pending, defendants filed a separate unlawful detainer action against Thompson, which went to trial. The jury in that case found in defendants' favor, and Thompson vacated the property.

## C. *Defendants' Motion for Summary Judgment*

In this action, defendants moved for summary judgment on Thompson's breach of contract claim. The trial court granted the motion. It reasoned, "Defendants showed [Thompson] failed to exercise the option agreement before it expired." "There is no dispute the option agreement provided [Thompson] could 'exercise the Option only by delivering a written unconditional notice of exercise, signed by [him], to [defendants]' and that the option period expired on 7/31/21." Thompson "concedes he did not deliver a signed, written, unconditional notice of exercise to defendant[s] by 7/31/21."

The trial court also rejected Thompson's argument that there were triable issues of fact as to whether (1) he had orally exercised the option, and (2) defendants had accepted his oral exercise. While Thompson's declaration stated that he had orally exercised the option, the court found this testimony was contradicted by his prior deposition testimony. It explained that Thompson testified at his deposition that "he 'exercised the option on this date, on [September 18], 2020.'[4] [Citation.] When asked 'How so,' he did not mention any oral statement. He instead replied: 'Because I signed the Purchase Agreement. Again, that's my understanding. I signed the

---

[4] Thompson stated at his deposition that he exercised the option on August 2, 2020, because he signed the purchase agreement on that date. It appears Thompson misspoke and provided the wrong date. While the purchase agreement is dated August 2, 2020, it is uncontested that Thompson and defendants signed it on September 18, 2020.

7

Purchase Agreement that day.' [Citation.] The court may 'give great weight to admissions made in deposition and disregard contradictory and self-serving affidavits of the party.'"

The trial court later entered judgment in defendants' favor. Thompson then filed a motion for a new trial, in which he argued that defendants had unlawfully retained the $50,000 initial deposit he had paid under the purchase agreement. The court denied the new trial motion.

On appeal, Thompson argues the court erred in granting summary judgment because there are triable issues of fact as to (1) whether the July 2020 agreement or the purchase agreement were independent and enforceable purchase contracts, (2) whether the option agreement was binding on Thompson, and (3) whether he effectively exercised the option.

Because we agree with Thompson's third argument, summary judgment was improperly granted. We do not address his other arguments because defendants did not move for summary adjudication on any of these issues below. Nor have they explained on appeal why summary adjudication would be proper as to any of these other theories. Since summary judgment was improperly granted, Thompson's arguments concerning the new trial motion are moot.

## DISCUSSION

### I.

#### STANDARD OF REVIEW

"'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.] A defendant moving for summary judgment must show the plaintiff's causes of action have no merit. It may do so by

8

negating an element of a cause of action or showing it has a complete defense to a cause of action. The burden then shifts to the plaintiff to show a triable issue of material fact as to the cause of action or defense." (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 182 (*Ghazarian*).)

"The trial court's decision is reviewed de novo, 'considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' [Citation.] The reviewing court 'liberally constru[es] the evidence in favor of the party opposing the motion and resolv[es] all doubts about the evidence in favor of the opponent.' [Citation.] Similarly, 'any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion.'" (*Ghazarian*, *supra*, 53 Cal.App.5th at p. 182.) A motion for summary judgment must be denied "'[w]here the evidence and inferences would allow a reasonable trier of fact to find the underlying fact in favor of [the opposing party] in accordance with the applicable standard of proof . . . .'" (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 877.)

II.

EXERCISE OF THE OPTION

There are triable issues of fact as to whether Thompson effectively exercised the option. In particular, there is evidence from which a reasonable factfinder could conclude that (1) Thompson orally exercised the option, and (2) defendants accepted his oral exercise and waived the written exercise requirement.

A. *Oral Exercise*

Thompson's declaration stated that he orally exercised the option on September 18, 2020. Thompson averred that "[w]hen I saw . . . the Option Agreement . . . , I told Tim Goodell and Tim Carr that I was exercising the

9

option to purchase the Property. It seemed like a meaningless statement because everyone understood that I was purchasing the Property. . . . Everyone knew that I had committed to purchasing the Property, that I had exercised the option."

The trial court found the above evidence was insufficient to raise a triable issue of fact because it conflicted with Thompson's prior deposition testimony. So, the court disregarded the declaration evidence as "'contradictory and self-serving.'" (Quoting *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 860.) As we discuss below, however, any perceived conflict between the evidence in Thompson's declaration and his deposition can be reasonably explained.

The rule relied on by the trial court arises from *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 (*D'Amico*). *D'Amico* held that statements in a plaintiff's declaration that are contradicted by "'a clear and unequivocal admission by the plaintiff, himself, in his deposition'" are insufficient to create "'a triable issue of fact.'" (*Id.* at pp. 21–22.) But later cases have clarified that the *D'Amico* rule "does not apply where there is a 'reasonable explanation for the discrepancy' or 'countenance ignoring other credible evidence that contradicts or explains that party's answers or otherwise demonstrates there are genuine issues of factual dispute.'" (*Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 658.)

Here, there is a reasonable explanation for the apparent discrepancy between Thompson's declaration and deposition testimony. As seen below, the relevant deposition questions can be interpreted as asking whether Thompson gave *written* notice exercising the option.

Q: "Mr. Thompson, did you ever send a *written notice* between August 1 of 2020 and July 31 of 2021, indicating unconditionally that you intended to exercise the option?" (Italics added.)

A: "I exercised the option on this date, on [September 18, 2020]."

Q: "How so?"

A: "Because I signed the Purchase Agreement. Again, that's my understanding. I signed the Purchase Agreement that day."

Q: "All right. So other than the Purchase Agreement, did you have a separate Unconditional Notice of Exercise, of exercising this option?"

A: "I didn't quite understand the question."

Q: "*I asked you about whether you sent an Unconditional Notice of Exercise of the option as required under section four of this Option Agreement, and your answer was yes.* [¶] And I asked you, how did you do it, and you said by signing the Purchase Agreement . . . right?" (Italics added.)

A: "Yeah. And it was my understanding I exercised my option agreement that day."

Q: "All right. And so then what's the point of the option agreement if that's the case?"

A: "I just thought it was part of what they were having me sign. There was a lot of trust going there. I mean, you know, they both congratulated me on buying the house."

Q: "So it's your testimony that the only way that you satisfied paragraph four; right, which requires a *written* Unconditional Notice of Exercise, was by signing [the purchase agreement]. Is that true." (Italics added.)

A: "That's true."

The trial court correctly observed that Thompson did not mention orally exercising the option when asked, "[h]ow so?" after claiming he had exercised it on September 18, 2020. But this question must be examined within the context of the prior question, which focused on whether Thompson had given written notice. The above questions all focused on whether Thompson had given written notice under the option agreement. Thompson could have reasonably understood the "[h]ow so" question as referring only to written notice.

Thompson never made "'a clear and unequivocal admission'" that he had not orally exercised the option. (See *D'Amico v. Board of Medical Examiners*, *supra*, 11 Cal.3d at pp. 21–22.) He was never asked whether he had orally exercised the option. Nor was he asked to identify every way he claimed to have exercised the option. And there is a reasonable explanation for his failure to mention orally exercising the option during the deposition questioning above. As such, the trial court should not have disregarded the evidence in Thompson's declaration that he orally exercised the option. (*Mackey v. Board of Trustees of California State University*, *supra*, 31 Cal.App.5th at p. 658.)

B.  *Acceptance of Oral Exercise*

Thompson's purported oral exercise of the option did not comply with the written exercise requirement. Nor were the option agreement's terms amended under the modification clause to allow for oral exercise of the option. However, there are issues of fact as to whether defendants waived the written exercise requirement and the modification clause through their words and conduct.

12

### 1. *Applicable law*

As to the written exercise requirement, "[t]he acceptance of the exercise of the option without objection to the form of the exercise waives any objection to the form of the exercise." (*Collins v. Marvel Land Co.* (1970) 13 Cal.App.3d 34, 40.) "If an optionor does not specify the alleged defects in the tender by the optionee, then a waiver results. [Citation.] The reason for this rule is that an optionee should be able to remedy any defects in his tender and prevent the optionor from remaining silent at the time of the tender and later surprise the optionee with hidden objections." (*Rollins v. Stokes* (1981) 123 Cal.App.3d 701, 713.)

*Collins v. Marvel Land Co.*, *supra*, 13 Cal.App.3d 34, involved an agreement requiring the plaintiffs to exercise an option through written notice to purchase land. Though the plaintiffs *orally* exercised the option, the defendants still opened escrow and prepared escrow instructions. The defendants later refused to sell the plaintiffs the property, claiming they had not exercised the option because they had not given written notice. (*Id.* at pp. 38–40.) The court rejected this argument at the demurrer stage. It explained that "even if [the plaintiffs'] notice did not comply with the option clause governing the mode of exercise, [they] have adequately pleaded facts showing a waiver of the requirement that the exercise be made in writing." (*Id.* at p. 40.) "[The plaintiffs] have alleged that the option agreement was accepted without reservation although the mode of acceptance was not that stated in the option contract. Although [the] defendants had the power to require a written exercise of the option, this requirement was for the benefit of [the] defendants and may be waived by them." (*Ibid.*)

The modification clause could also be waived. "[N]otwithstanding a provision in a written agreement that precludes oral modification, the

parties may, by their words or conduct, waive contractual rights. [Citations.] "'[T]he pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.'" [Citation.] [Citation.] "'The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.'"" (*Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 78.) Waiver occurs """"when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' [Citation.]" [Citation.]' [Citation.] Waiver is ordinarily a question of fact unless "'there are no disputed facts and only one reasonable inference may be drawn.'"" (*Ibid.*)

### 2. *Evidence in the record*

A reasonable factfinder could infer from the evidence that defendants accepted Thompson's oral exercise of the option and waived both the written exercise requirement and the modification clause.

First, Thompson's declaration contains evidence that Tim Goodell and his real estate broker, Tim Carr, congratulated Thompson on purchasing the property after signing the property documents on September 18, 2020:

- When Thompson saw the option agreement on September 18, 2020, he "told Tim Goodell and Tim Carr that [he] was exercising the option to purchase the Property. . . . Everyone knew that [he] had committed to purchasing the Property, [and] that [he] had exercised the option."
- "On September 18, [2020,] Tim Goodell congratulated [Thompson] on purchasing the Property. He never said or even intimated that [Thompson] merely had an option to purchase, the potential to purchase, or anything similar."

14

- "Tim Carr told [Thompson] that [Thompson] was purchasing the Property. Like Tim Goodell, he did not say anything that could be interpreted as uncertainty about whether [Thompson] had committed to purchasing the Property."

Second, Thompson's declaration sets forth text messages from Tim Goodell to Thompson. It can be inferred from these messages that Tim Goodell attempted to open escrow after the property documents were signed, signifying that he believed the sale was occurring. These messages also indicate that Tim Goodell pushed Thompson to quickly obtain financing to complete the sale, so Tim Goodell could use the sale proceeds to buy another property.

- On September 23, 2020, Tim Goodell texted Thompson, "'Call me about the escrow . . . there is a problem.'" (Ellipsis in original & boldface omitted.)

- On September 30, 2020, Tim Goodell texted Thompson, "'You have an update? [Thompson], you said you would give Tim carr [*sic*] your Loan [*sic*] person his number. [¶] I need something solid so I can make an offer on a house, I need to get here full time and have a home for my son . . . it is not good for him living with my mom. [¶] I have identifie[d] a house [and] would like to make an offer but I need something solid from you and you[r] loan guy. [¶] PLEASE!!! I need to get this done for the sake of my son.'" (Ellipsis in original & boldface omitted.)

- On October 1, 2020, Tim Goodell texted Thompson, stating, "'[Thompson], pretty disappointed you didn't even respond to my text. I'm pretty much at the end of my rope [Thompson] . . . I need to get something done now . . . I can't wait. You told me you'd get more cash to me and you said they would call Tim Carr . . . none of this has

15

happened . . . be been here [*sic*] 3 weeks. [¶] *I want you to have the house* but you're not helping your situation.'" (Ellipsis in original & boldface omitted, italics added.)

- On October 13, 2020, Tim Goodell texted Thompson, "'We talked to your loan guy and I need to speak to you about it.' . . . 'I'm pretty disturbed by what I heard from your loan guy. So if you blow me off I'm gonna void the contract and file an eviction notice.'" (Boldface omitted.)

- On October 14, 2020, Tim Goodell texted Thompson, "'[Tim Carr] is expecting your call today, I'm gonna move forward if you don't talk to him and things don't change.'" (Boldface omitted.)

It is unclear from the record whether Thompson responded to these messages. But Thompson's declaration states that he attempted to speak to Tim Goodell about the property's sale numerous times between December 2020 and July 2021, but Tim Goodell did not respond. Tim Goodell then told Thompson on July 30, 2021, that he wanted the property back. Thompson claims he told Tim Goodell that they "had made a deal, and he should stick with it." Tim Goodell never "disagree[d] with [Thompson's] statement that [he] had purchased the Property, [and] that [they] had a deal. Tim Goodell just said he wanted the Property back."

Thompson's declaration also states that Tim Goodell never told Thompson "that he had never received a written notice of exercise of option. If Tim Goodell had mentioned [Thompson] had not yet exercised the option or had not sent a written notice of exercise, [Thompson] could have remedied by sending written notice." But "[e]verything Tim Goodell had done and said [until July 31, 2020], confirmed [Thompson's] belief that [he] already had exercised the option."

16

On appeal, we must liberally construe the above evidence in Thompson's favor. (*Ghazarian, supra,* 53 Cal.App.5th at p. 182.) When doing so, there are reasonable factual disputes that preclude summary judgment. A reasonable factfinder could conclude based on the above evidence that defendants initially accepted Thompson's oral exercise of the option, waiving the written exercise requirement and modification clause. But they later changed their minds and belatedly claimed that he had failed to comply with the written exercise requirement. Summary judgment was improperly granted because the evidence and reasonable inferences would allow a trier of fact to find in Thompson's favor. (*Faust v. California Portland Cement Co., supra,* 150 Cal.App.4th at p. 877.)

In response, defendants cite evidence indicating that Thompson did not orally exercise the option, and even if he did, defendants did not accept it. Their evidence shows that (1) no deed of transfer was ever prepared for the property, (2) escrow was never opened, (3) the escrow company told him not to open escrow until the option was exercised, and (4) Thompson did not attempt to close the sale by November 18, 2020, which would have reduced the property's purchase price to $3,975,000. But this argument fails to show that there are no triable issues of fact. Rather, it underscores that there is competing evidence that a factfinder must weigh at trial.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to vacate its order granting defendants' motion for summary judgment and enter a new order denying it. Thompson is entitled to his costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


SERVINO, J.


SCHWARM, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.